UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-CV-11148-RGS

IRVING A. BACKMAN,
Plaintiff

v.

IGOR V. SMIRNOV and
GLOBAL QUANTECH, INC.,
Defendants


MEMORANDUM AND ORDER
ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

November 17, 2010

STEARNS, D.J.

Plaintiff Irving Backman brought this lawsuit against defendants Igor Smirnov and

Global Quantech, Inc. (GQI), alleging breach of contract (Count I), quantum meruit (Count

II), violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §

11 (Count III), and fraud and misrepresentation (Count IV).  The dispute arose over a falling

out between Smirnov and Backman over the marketing of a water "activator" touted as a

fount of miraculous medical benefits.  Defendants moved for summary judgment on August

26, 2010, after the close of discovery.  A hearing was held on the motion on November 1,

2010.

BACKGROUND

The material facts, in the light most favorable to Backman as the nonmoving party,

are as follows.  In January of 2004, Backman found Smirnov on the Internet and contacted

him about his "invention" of a means to "activate" water using Magnetic Resonance Effect

Technology (MRET).  Pl.'s SOF ¶ 89.  Backman had a longstanding interest in magnetic resonance (MR) and a thirty-five year history of developing, funding, researching, marketing, and manufacturing products based on "breakthrough" technologies.  Id. ¶ 2. Backman invited a discussion with Smirnov as to how his background might be put to use to advance their "common interest."  Id. ¶ 89.  During these preliminary discussions, Smirnov made oral and written representations that MRET activated water conferred significant therapeutic health benefits on patients suffering from grave illnesses.[1]  Id. ¶ 90.

In March of 2004, Smirnov and Backman agreed orally that in exchange for compensation "in an amount to be agreed upon and commensurate with the effort expended," Backman would provide consulting services, marketing expertise, and access to his many contacts in a variety of industries to promote and validate MRET on a worldwide basis.  Am. Compl. ¶ 17.

On March 9, 2004, Backman and Smirnov (signing on behalf of GQI) entered into a written "Agreement of Non-Circumvention" (NCA).  Under the NCA, Backman agreed to market MRET to potential investors, scientific researchers, and end users.  Id. ¶ 20.  In exchange, GQI agreed to abstain from entering into any contracts or business arrangements with persons or entities introduced by Backman without paying him a finder's fee.  Id. ¶ 21.  Later in 2004, the NCA was amended to include another GQI product

---

[1]Smirnov claims that MRET water "transmits pre-recorded molecular activity messages to biological systems."  How MRET Water Activator Works, HEALING WATER TECHNOLOGY (accessed Nov. 16, 2010),
http://www.healingwatertechnology.com/how-mretwater-works.php. He told Backman that MRET helped to prevent Alzheimer's disease, redressed problems of blood contamination, optimized the human immune system, suppressed cancer cells, and performed other medical feats.  Pl.'s Opp'n at 2.

named the MRET Shield or Electromagnetic Radiation Optimum Neutralizer (EMRON).[2] Id. ¶ 23.[3]

Over the next three years, Backman provided Smirnov and GQI with regular status reports regarding the individuals and institutions whom he had approached in his efforts to market MRET and EMRON. Backman began each email update with the iteration, "To supplement our letter agreement of March 9, 2004, . . . ." Id. ¶ 26. At Backman's request, Smirnov acknowledged each of the "amendments" by countersigning and returning them to Backman. Id. ¶ 27. In connection with his marketing efforts, Backman purchased at least $52,000 of MRET and EMRON products from GQI between 2004 and 2007.[4] At least one of Backman's contacts, Dr. Abraham Lieberman of the Lieberman Parkinson Clinic, received an invoice in the amount of $500 for the shipment of 15 MRET water activators, Pl.'s SOF ¶ 100, although no finder's fee was ever paid to Backman.[5]

From 2004 through 2006, Backman conducted extensive market research to identify prospective users, scientific researchers, and licensees of Smirnov's inventions. Am. Compl. ¶ 28. While he initiated and maintained the relationships with these contacts, he depended on Smirnov to provide the scientific and technical information that he used to

---

[2]EMRON is a device designed to compensate for the negative effects of electromagnetic radiation produced by cell phones, power lines, computers, microwave ovens, and other consumer devices utilizing electromagnetic energy.

[3]Smirnov disputes that EMRON was ever part of any agreement with Backman.

[4]Backman resold a number of the units that he had purchased, reducing his net out-of-pocket costs to $29,490.56. Pl.'s Post-Hr'g Br. at 3.

[5]Although defendants acknowledge sending Dr. Lieberman the invoice, they contend that they never received any payment from Dr. Lieberman or from any other of Backman's contacts. Smirnov states that he and Backman had agreed by email that Dr. Lieberman would be provided the MRET units free of charge. Defs.' Reply at 2.

market MRET and EMRON.  Id.  Backman and Smirnov frequently discussed the need for the positive health benefits of MRET to be independently verified, utilizing data or studies generated by credible universities.  Id. ¶ 30.

Although Smirnov never told Backman directly, he did not agree with Backman that peer review or third-party validation of MRET was necessary or even desirable.  Despite Smirnov's reservations, on November 30, 2004, the two men executed an agreement (Toronto Agreement) in which they undertook to sponsor a scientific study of the benefits of MRET (Toronto Study) that would be funded two-thirds by Backman and one-third by Smirnov and GQI.[6]

Under the Toronto Agreement, Backman was to provide a final report and data analysis to GQI that both parties had the "right to use at their own consideration."  Id.  With respect to Backman's compensation, the Toronto Agreement stipulated that any "fees, royalties[,] or licenses resulting from use of the final report or data analysis" would recognize Backman's contribution by conferring a "reasonable portion of such monetary benefits" as "mutually agreed upon."  Id.

Smirnov eventually turned the results of the Toronto Study into an abstract, which he instructed Backman to use in the marketing campaign.  Am. Compl. ¶ 33.  Smirnov then authored and purportedly published an article entitled "The Physiological Effect of MRET Activated Water on Patients Suffering from AIDS" in the November 2, 2006 issue of

_____

[6]Smirnov signed the Toronto Agreement on behalf of GQI and not personally. During the November 1, 2010 hearing, Backman stated that he ultimately paid for the entire Toronto Study because Smirnov reneged on his commitment to pay one-third of the cost.

Explore: The Journal of Science and Healing, Vol.15, no.2: 37-40.[7]  In the article, Smirnov quoted the Toronto Study extensively and suggested that the study's data confirmed prior clinical observations of the positive effects of MRET activated water on AIDS/HIV patients, among others.  Id. ¶ 35.  Smirnov also incorporated results from the Toronto Study in an article he published on Alzheimer's disease, as well as in a book that he authored about the benefits of MRET.  Pl.'s SOF ¶¶ 112-113.

During the first two years of the NCA, GQI's revenue remained relatively flat.  GQI's gross income totaled $465,000 in 2004 and $485,000 in 2005.  After the Toronto Study results were made public, GQI's gross income skyrocketed to almost $1,000,000 in 2006, $1,900,000 in 2007, and $2,900,000 in 2008.  Id. ¶¶ 114-116.  Smirnov attributes the growth in sales to intensive marketing by BioPro, one of GQI's biggest distributors.  Backman, for his part, credits the Toronto Study for the sudden increase in revenues, noting that BioPro made liberal use of the Toronto Study data in its marketing materials.  Id. ¶ 118.

Beginning in August or September of 2006, Smirnov began altering Backman's status reports.  Among other changes, he excised references to certain corporations and countries previously listed as potential licensees, as well as references to EMRON and to international licensees, claiming that some of these potential customers were already under exclusive distribution agreements.  Am. Compl. ¶¶ 42-44.  On or about September 21, 2006, Smirnov's wife (Irina) informed Backman that she had assumed the role of Smirnov's

---

[7]While such a journal exists, its November-December 2010 issue is designated as the sixth in Volume 6.  Dr. Dean Radin, the Coeditor-in-Chief, is an educational psychologist who specializes in parapsychological phenomena.

business manager and that if his relationship with Smirnov were to continue, the NCA would have to be replaced by a new agreement. Smirnov subsequently drafted, signed, and mailed to Backman an Amended Agreement, but Backman refused to sign it.[8]

On November 6, 2006, Smirnov emailed Backman claiming that he had never recommended that MRET activated water be used for medical purposes. He warned Backman that "[y]our decision to provide MRET Water Activators to medical doctors and other customers is your personal decision and full responsibility." Pl.'s Opp'n - Ex. 10. The relationship between the two men completely collapsed on March 7, 2007, when Smirnov's attorney sent Backman a letter terminating the NCA.

In addition to equitable relief, Backman seeks damages of $29,490.46 for the MRET units that he purchased for marketing purposes, but was unable to resell, $1,557.98 in shipping costs, $5,350 for the unreimbursed costs of the Toronto Study, $2,350 for the funding of additional studies to validate MRET, and $120,000 for secretarial and staffing expenditures from 2004 through 2008. Backman also seeks compensation for the "thousands of hours [he spent] diligently marketing and promoting MRET activated water and EMRON technologies." Sec. Suppl. Answer to Interrog. No. 13. His "conservative" valuation of his services is $500 per hour. Id.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

---

[8]Backman objected to the less favorable terms of the Amended Agreement, including the termination of the right to compensation three years after the date of an initial introduction to a client and the insertion of a choice of law clause stipulating that California law would govern any lawsuit brought by Backman against Smirnov. Id. ¶ 47.

6

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(c)(2).  "A 'genuine' issue is one that could be resolved in favor of either party, and a

'material fact' is one that has the potential of affecting the outcome of the case."  Calero-

Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004), citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248-250 (1986).

### Count I – Breach of Contract

"To state a claim for breach of contract under Massachusetts law, a plaintiff must

allege, at a minimum, that there was a valid contract, that the defendant breached its duties

under the contractual agreement, and that the breach caused the plaintiff damage."

Guckenberger v. Boston Univ., 957 F. Supp. 306, 316 (D. Mass. 1997) (citations omitted).

To establish a breach, plaintiff has the burden of proving the failure of the defaulting party

to conform to one or more of the contract's material terms.   A term is material when it

involves "an essential and inducing feature" of the contract.  Buchholz v. Green Bros. Co.,

272 Mass. 49, 52 (1930).  "[I]f the materiality question in a given case admits of only one

reasonable answer (because the evidence on the point is either undisputed or sufficiently

lopsided), then the court must intervene and address what is ordinarily a factual question

as a question of law."  Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994).

### The Non-Circumvention Agreement

 Addressing first the NCA, defendants claim that Backman's contract claim is barred

by the Business Broker Statute of Frauds, Mass. Gen. Laws ch. 259, § 7. The Statute

provides in relevant part:

> [a]ny agreement to pay compensation for service as a broker or finder or for
> service rendered . . . in negotiating the purchase, sale or exchange of a

> business, . . . shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized.

Id. Backman concedes that he provided Smirnov with some services that could be fairly characterized as those of a broker/finder, but that these made up only a minuscule portion of the work he performed under the NCA.[9] The definitions of "broker" and "finder" are well established.

> The terms "broker" and "finder" are not technical terms and, when given their ordinary meanings and construed according to their common usage, encompass activities performed by [the defendant employment agency]. . . . A broker is "[a]n agent who acts as an intermediary or negotiator, esp[ecially] between prospective buyers and sellers; a person employed to make bargains and contracts between other persons in matters of trade, commerce, and navigation." Black's Law Dictionary 187 (7th ed. 1999). A finder is "[a]n intermediary who brings together parties for a business opportunity. . . .   A finder differs from a broker-dealer because the finder merely brings two parties together to make their own contract, while a broker-dealer usu[ally] participates in the negotiations." Id. at 646. A finder locates, introduces, and brings parties to a transaction together, while a broker does more, attempting to bring the parties to an agreement.

Cantell v. Hill Holiday Connors Cosmopulos, Inc., 55 Mass. App. Ct. 550, 553-554 (2002) (italics removed).

The bulk of Backman's efforts were focused on the funding and marketing of MRET as the NCA contemplated.  Dr. Lieberman appears to be the only customer of Smirnov's for whom Backman acted in any traditional sense as a broker.  In all other instances, Backman alone maintained and managed the relationships with potential investors and promoters of MRET and EMRON.  Backman's recruiting and funding of the Toronto Study

---

[9]Defendants do not contest that the NCA meets the Statute of Frauds requirement of a writing.  Rather, they contend that the NCA is not a perfected "agreement" within the legal meaning of the term.

could not by any definition be categorized as a broker's service.

Defendants' fallback argument is that the NCA is not an enforceable contractual agreement because it lacks an essential term, namely a specification of the exact compensation that Backman was to receive or any mechanism by which the payment could be determined with any degree of certainty. Defs.' Mot. Summ. J. at 4. Defendants contend that the NCA is merely an agreement to agree at some unspecified time in the future. Id. at 5.

Whether a document contains the essential elements of an enforceable contract is a question of law. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 709 (1992). "It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). Nonetheless, "it is essential to the existence of a contract that its nature and the extent of its obligations be certain." Caggiano v. Marchegiano, 327 Mass. 574, 579 (1951). Ultimately, it is the intention of the parties to be bound that is controlling. Hunneman Real Estate Corp. v. Norwood Realty, Inc., 54 Mass. App. Ct. 416, 421 (2002). "[T]here is no surer way to find out what parties meant, than to see what they have done." Pittsfield & N.A.R. Corp. v. Boston & A.R. Co., 260 Mass. 390, 398 (1927) (citation omitted).

It is on this last point that Backman's argument proves persuasive. He makes the compelling point that Smirnov's conduct, both personally and through his business agent (wife), contradict any contention that Smirnov did not regard the NCA as a binding contract. In her September 21, 2006 telephone call to Backman, Irina Smirnov demanded that the

9

NCA be rescinded and revised. Smirnov subsequently drafted an "Amended Agreement" intended to replace the NCA and asked Backman to sign it, but Backman refused.  In other words, a reasonable jury could find from Smirnov's own conduct – which occurred against a backdrop of over three years of unobjected-to performance by Backman – that the NCA was viewed by both men as a binding agreement.

Defendants cite <u>Caggiano</u> at length, arguing that its language is controlling.  The court disagrees.  <u>Caggiano</u> is distinguishable on several grounds, the most significant of which is the "entirely executory" nature of the agreement at issue in which "no terms [on the subject of compensation were] expressed at all."[10]  <u>Caggiano</u>, 327 Mass. at 582. Where, as here, "[t]he plaintiff is not seeking damages for breach of an executory contract but is seeking to recover reasonable compensation for services which he rendered at the request of the defendants and for their benefit," the agreement may be enforceable even though the terms relative to compensation are "stated in broad and general terms." <u>Cygan v. Megathlin</u>, 326 Mass. 732, 734-735 (1951).  The NCA stipulated that Backman's compensation would be paid in a reasonable amount "mutually satisfactory to all."  As the Supreme Judicial Court reprised in <u>Cygan</u>:

> [t]his court has gone far in enforcing contracts where the consideration to be paid by one party to the other was expressed as a fair and equitable share of the profits, <u>Noble v. Joseph Burnett Co.</u>, 208 Mass. 75; to pay a sum which would be right and satisfactory, <u>Silver v. Graves,</u> 210 Mass. 26; to "make it right" with an injured employee by the payment of some compensation in addition to the sum paid for a release, <u>Brennan v. Employers Liab. Assurance Corp., Ltd.</u>, 213 Mass. 365; or to treat him right by the payment of some additional compensation until he was able to return to work, <u>Ferris</u>

---

[10]An executory contract is one in which the contracting parties owe one another ongoing duties of performance.  <u>Summit Inv. and Dev. Corp. v. Leroux</u>, 69 F.3d 608, 610 n.3 (1st Cir. 1995).

v. Boston & Maine R.R., 291 Mass. 529; to pay an employee well and to
satisfy him, Leverone v. Leverone, 220 Mass. 149; or to pay for services the
value of which was to be left to future determination, Evers v. Gilfoil, 247
Mass. 219 . . . .

Id. at 734.  The compensation terms of the contract between Backman and Smirnov were

no less definite than those in the above-cited agreements.

Defendants finally insist that even if the agreement is enforceable, Backman cannot

prove that GQI ever earned a penny of profit from his efforts.  The argument, however, is

one of fact, not law.  It is undisputed that after the Toronto Study was published, the gross

revenues of GQI saw a sixfold increase.  Whether the increased revenues are attributable

to the Toronto Study (and Backman's other efforts) is for the jury to determine, and if the

proportion of the gross revenues that make up profits have not yet been ascertained, that

may eventually be a proper subject of a petition for an equitable accounting.  See Noble,

208 Mass. at 82.  Therefore, defendants' motion for summary judgment as to the NCA

breach of contract claim will be denied.

**The Toronto Agreement**

With respect to the Toronto Agreement, defendants make the same argument – that

the Toronto Agreement is "fatally indefinite as to the essential terms of the promise" and

that Backman's damages are therefore "purely speculative."  Defs.' Mot. Summ. J. at 7-8.

For the reasons previously cited, the argument fails.  As in the case of the NCA, the

Toronto Agreement is not completely silent as to the compensation Backman was to

receive for the use of the Toronto Study data.  The agreement provides that "any monetary

benefits including fees, royalties[,] or licenses resulting from the use of [the study's data]"

will recognize Backman's contribution and that "a reasonable portion of such monetary

benefits will be allocated to Irving Backman as mutually agreed upon." As explained above, where the terms relative to compensation are present but "stated in broad and general terms," an agreement may still be enforceable.  See Cygan, 326 Mass. at 733-734.  It is for the trier of fact to determine what a "reasonable portion" of the "monetary benefits" would be in this case.  Defendants' motion for summary judgment as to the Toronto Agreement breach of contract claim will also be denied.

### Count II – Quantum Meruit[11]

Quantum meruit "is a claim independent of an assertion for damages under the contract, . . . ." J.A. Sullivan Corp. v. Commonwealth., 397 Mass. 789, 793 (1986).  "The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party." Salamon v. Terra, 394 Mass. 857, 859 (1985).  Like unjust enrichment, quantum meruit is a theory of recovery and not an independent cause of action.  In other words, if a jury finds that the agreement alleged in Count I was inchoate and therefore unenforceable, it may consider quantum meruit as an alternative (*but not as an additional*) theory under which Backman may recover.

In Massachusetts, the elements of a quantum meruit recovery are: (1) the plaintiff conferred a reasonable benefit upon the defendants; (2) defendants accepted the services with the reasonable expectation of compensating the plaintiff; and (3) the plaintiff provided the services with the reasonable expectation of receiving compensation. See Bolen v. Paragon Plastics, Inc., 747 F. Supp. 103, 106-107 (D. Mass. 1990).

---

[11]Because the court's determination that Count 1 is not barred by the Statute of Frauds applies equally to Count 2, the point need not be belabored.

In this case, a reasonable jury could find that Backman has established the prima facie elements of a claim in quantum meruit.  Backman conferred a benefit on defendants by organizing and funding the Toronto Study, a benefit that defendants recognized by incorporating the data from the Study in the literature ballyhooing the benefits of MRET. Defendants accepted Backman's services with the reasonable expectation of compensating him with a "reasonable portion" of the "monetary benefits," belying defendants' argument that Backman agreed to perform at his own risk.  When a party voluntarily accepts a valuable service or benefit, having had the option to accept or reject it, the court may infer and enforce a promise to pay.  See Anisgard v. Bray, 11 Mass. App. Ct. 726, 729 (1981). Therefore, defendants' motion for summary judgment as to the claim in quantum meruit as an alternative theory to breach of contract will be denied.

### Count III – Violation of the Massachusetts Consumer Protection Act

Section 2(a) of Chapter 93A declares unlawful, "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  Mass. Gen. Laws ch. 93A, § 2(a). Smirnov argues that the Chapter 93A claims fail because they are derivative of Backman's breach of contract and fraud claims.  See Edlow v. RBW, LLC, 2010 WL 2034772,  at *8 (D. Mass. May 21, 2010), citing Pimental v. Wachovia Mortg. Corp., 411 F. Supp. 2d 32, 40 (D. Mass. 2006) ("Since [plaintiff] has failed to allege sustainable breach of contract or negligence claims, and the Chapter 93A claim is based upon the previous two claims, there is no basis for finding [defendant] liable under Chapter 93A.").  As a claim under Chapter 93A is equitable and a matter for the court and not the jury to decide, the force of defendants' arguments can be assessed after the trial of the substantive claims.  See

13

Acushnet Fed. Credit Union v. Roderick, 26 Mass. App. Ct. 604, 606 (1988).  Therefore, a ruling on Count III will be deferred.

### Count IV – Fraud

To make out a claim for fraud or deliberate misrepresentation,[12] a plaintiff must show that: (1) the defendant made a false representation of material fact; (2) with knowledge of its falsity; (3) for the purpose of inducing the plaintiff to act thereon; and (4) that the plaintiff reasonably relied upon the misrepresentation as true; and (5) acted upon the misrepresentation to his damage.  See Barrett Assocs., Inc. v. Aronson, 346 Mass. 150, 152 (1963); Masingill v. EMC Corp., 449 Mass. 532, 540 (2007).  Defendants seek judgment as a matter of law with respect to the two species of misrepresentation alleged by Backman: (1) those regarding Smirnov's commitment to the obligations of the Toronto Agreement; and (2)  Smirnov's alleged false statements regarding the supposed health benefits of MRET activated water.

### Cooperation Misrepresentations

---

[12]To the extent that Backman is alleging negligent misrepresentation, the claim is barred by the economic loss doctrine, which requires that any tort claim sounding in negligence be supported by a showing of personal injury or physical damage to property.  See FMR Corp. v. Boston Edison Co., 415 Mass. 393, 395 (1993) ("Purely economic losses [are] unrecoverable in tort and strict liability actions absent personal injury or property damage.").  At the summary judgment hearing, Backman specified his damages as a loss of the opportunity to spend the "last best years" of his life with his family or in pursuit of some more lucrative economic opportunity.  A negligent interference with an economic opportunity that does not cause physical or property damage falls directly within the economic loss doctrine.  See Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 469 (2009).  On the other hand, the doctrine does not apply in Massachusetts to intentional torts.  See Canal Elec. Co. v. Westinghouse Elec. Co., 973 F.2d 988, 998 (1st Cir. 1992) (the Massachusetts economic loss doctrine "restricts liability for . . . negligently-caused economic harm, though, at the same time, it permits recovery . . . where the defendant engages in an intentional tort . . . .").

Backman claims that Smirnov misled him into believing that he fully supported Backman's efforts to obtain independent validation of MRET and would pay a one-third share of the costs of the Toronto Study.  Pl.'s Opp'n Mot. Summ. J. at 14.  Defendants argue that Backman cannot affirmatively prove that Smirnov gave any knowingly false assurance to Backman about his commitment to the Toronto Study.  Defs.' Mot. Summ. J. at 12.  The most that Backman can point to is Smirnov's deposition testimony that when Backman broached the idea of the Toronto Study, Smirnov did not believe that it would prove helpful to the MRET marketing campaign and that he "didn't accept" Backman's statement that the Study would open the door to "a broader range of applications." Smirnov Dep. at 129.

As a rule, "nondisclosure does not amount to fraud and is not a tort of any kind," unless the non-disclosing party is under a duty to speak.  <u>Greenery Rehab. Grp. Co. v. Antaramian</u>, 36 Mass. App. Ct. 73, 77 (1994); <u>see</u> <u>also</u> <u>Rood v. Newberg</u>, 48 Mass. App. Ct. 185, 192 (1999).  That Smirnov may not have shared Backman's enthusiasm for the Toronto Study or that Smirnov may have ultimately breached the Toronto Agreement (if the trier of fact so finds) does not advance Backman's argument.  It is not a tort, or even a moral wrong, to breach a contract so long as one is willing to pay for any damages caused by the breach.[13]  The defendants' motion for summary judgment on the fraud claim (Count IV) with respect to the cooperation misrepresentations will therefore be <u>allowed</u>.

### Health Benefits Misrepresentations

---

[13]Smirnov states that he intended to honor the Toronto Agreement at the time it was negotiated, but later changed his mind. Defs.' SOF ¶ 75.  Changing one's mind is not proof that an earlier statement was false. <u>McEvoy Travel Bureau, Inc. v. Norton Co.</u>, 408 Mass. 704 (1990).

Backman also claims that Smirnov misled him about the (nonexistent) health benefits of the MRET technology. To the extent that Smirnov admits that such statements were made, he alleges that Backman's claim is barred by the relevant statute of limitations, Mass. Gen. Laws ch. 260, § 2A. Backman filed his Complaint on June 2, 2008, three and one-half years after the NCA was negotiated with Smirnov. Given Backman's knowledge and experience with MR technology, Defs.' SOF ¶¶ 12-16, 26, defendants argue that he knew or should have known by the end of 2004 at the latest, that the claims of MRET's preternatural health benefits were sheer quackery. This point is telling. The evidence suggests that Backman not only knew that the health claims were false, but that he willingly engaged with Smirnov in a fraudulent scheme to promote them to others – including vulnerable AIDS/HIV patients – by touting the data of the dubitable Toronto Study. In implicit recognition of the shakiness of his position, Backman is careful to avoid any argument that the health claims were in fact false.[14] Rather, "[i]t is the fact that Smirnov made those representations to induce Backman into a contractual relationship, and then subsequently denied ever making those claims, that forms the fraud from which Backman seeks to recover." Pl'.s Opp'n Mot. Summ. J. at 19. Denying having made a statement that one did in fact make is not fraud if there is no allegation that the disclaimed statement was false. The defendants' motion for summary judgment on the fraud claim (Count 4) with respect to the health benefits misrepresentations will therefore be <u>allowed</u>.[15]

---

[14]The skeptical reader might consult Stephen Lower, <u>Wonky Water weirdness and quackery: Junk Science in the Marketplace</u>, http://www.chem1.com/CQ/wonkywater.html (last updated Feb. 24, 2010), and make his or her own judgment.

[15]Counts 5 and 6, which seek injunctive and declaratory relief, depend largely on the jury's resolution of the contract claims and need not now be addressed.

ORDER

For the foregoing reasons, defendants' motion for summary judgment as a matter of law with respect to the claims for breach of contract (Count I) and quantum meruit (Count II) are **DENIED**.   With respect to the fraud and misrepresentation claims (Count IV), defendants' motion is **ALLOWED**.   The Chapter 93A claim will be decided if necessary by the court after the jury trial and is therefore **DEFERRED**.   The Clerk will set the case for trial before a jury commencing at 9:00 a.m. on February 14, 2011.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

17